CA Nos. 14-15613 and 14-15680

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | | | |
|---|---|---|---|
| **RICHARD M. GILMAN, et al**., | ) | | |
| | ) | | |
| Plaintiffs/Appellees/Cross-Appellants, | ) | DC No. 2: 05 CV 830 LKK | |
| | ) | Eastern District of California | |
| v. | ) | | |
| | ) | | |
| **EDMUND G. BROWN, JR., et al,** | ) | | |
| | ) | | |
| Defendants/Appellants/Cross-Appellees. | ) | | |
| | ) | | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO STAY THE JUDGMENT PENDING APPEAL**
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA
Honorable Lawrence K. Karlton, Judge

HEATHER WILLIAMS
Federal Defender
DAVID PORTER
MONICA KNOX
Assistant Federal Defenders
801 I Street, Third Floor
Sacramento, California 95814
(916) 498-5700

Attorneys for Plaintiffs-Appellants

CA Nos. 14-15613 and 14-15680

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | | |
|---|---|---|
| **RICHARD M. GILMAN, et al**., | ) | |
| | ) | |
| Plaintiffs/Appellees/Cross-Appellants, | ) | DC No. 2: 05 CV 830 LKK |
| | ) | Eastern District of California |
| v. | ) | |
| | ) | |
| **EDMUND G. BROWN, JR., et al,** | ) | |
| | ) | |
| Defendants/Appellants/Cross-Appellees. | ) | |
| | ) | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS'
## MOTION TO STAY THE JUDGMENT PENDING APPEAL

Defendants seek a stay pending resolution of the appeal in this class-action, civil rights case. Defendants have not, however, satisfied the burden they bear to obtain a stay. Most significantly, Defendants have not shown that irreparable harm is probable, an absolute prerequisite for a stay, *Leiva-Perez v. Holder*, 640 F.3d 962, 965 (9th Cir. 2011); nor have they shown that the relative hardships to the parties - "the critical element" in determining whether a stay is justified, *Abbassi v. INS*, 143 F.3d 513, 514 (9th Cir. 2001)(en banc) - favors a stay. Indeed, Defendants have not established that *any* of the relevant factors favor the granting of a stay.

1

## A.  The Standard for a Stay

The factors to be considered in evaluating whether to grant a stay are: likelihood of success on appeal, irreparable harm to party requesting stay, whether other parties will be injured by stay, and public interest.  *Hilton v. Braunskill*, 481 U.S. 770 (1987).  This Court recently, after considering Supreme Court and circuit cases on stay factors during the last decade, set forth the test:  the party seeking a stay must show irreparable harm is probable *and* either:

> (a) a strong likelihood of success on the merits and that the public interest does not weigh heavily against a stay; *or*
>
> (b) a substantial case on the merits and that the balance of hardships tips sharply in the petitioner's favor.

*Leiva-Perez*, 640 F.3d at 970 (emphasis added).

## B.  Defendants Have Not Shown a Probability of Irreparable Harm

A threshold showing of irreparable harm by the party requesting the stay is "a necessary but not sufficient condition" for the issuance of the stay; regardless of the party's proof as to the other factors, "a stay may not issue" without the threshold showing of irreparable harm.  *Leiva-Perez*, 640 F.3d at 965.  The *possibility* of irreparable harm is not sufficient; Defendants must show that irreparable harm is *likely* or *probable* if the stay is not granted.  *Id.* at 968.  Irreparable harm will not be assumed; it must be specific to the case.  *Id.* at 969.  General and nonspecific

assertions that a lack of a stay will cause injury or hardship to the state are insufficient to show irreparable harm. *M.R. v. Dreyfus*, 663 F.3d 1100, 1119-20 (9th Cir. 2011)(as modified on denial of rehearing *en banc*, 697 F.3d 706).

When considering Defendants' assertion of irreparable harm under these standards, it is clear Defendants have not met their burden of showing a probability of irreparable harm.

## 1. Proposition 9

The sole challenge raised and resolved in this case relative to Proposition 9 was to the provision lengthening and setting mandatory minimums to the deferral periods, the period of time the parole board determines a prisoner denied parole will have to wait before he will again be considered for parole. The relief granted has *no* impact on continued implementation of all other provisions of Proposition 9.

Defendants argue that "the People" will be deprived of "their law" for "months ... or years" while the appeal is litigated. (Motion for Stay [hereinafter "Motion"] at 16.) If that constituted irreparable harm, a stay would be automatic every time a federal court declared any portion of a state law unconstitutional. This Court has expressly held that irreparable harm must be specific to the particular case and is not satisfied where the harm posited would apply to every similar case. *Leiva-Perez*, 640

F.3d at 969.[1]

Defendants say that the parole board has spent "considerable time and resources" in implementing Proposition 9, including training of board employees and that without a stay "the Board will be deprived of the fruits of these efforts during appeal." (Motion at 16-17.) Again, that is non-specific harm that would apply in every case.[2] Moreover, it is an argument divorced from the reality of a parole hearing and the limits of the specific issue in this case.

As noted, only a single provision of Proposition 9 is at issue here. Under such circumstances, the parole board is not deprived "of the fruits" of training or resources. If the Proposition 9 judgment is not stayed, the result would be that the parole board would choose a number between one and five for the deferral instead of a number between three and fifteen in the cases in which it denies parole; the judgment does not

---

[1] As part of their argument that "the People" will be deprived of their law without a stay, Defendants assert that Proposition 9 "has been applied without interruption since it was enacted." (Motion at 16.) That is not accurate, as the evidence presented at trial regarding the *Rutherford* prisoners (who were given old law deferrals *after* the passage of Proposition 9) showed, *see* District Court Docket #532 [hereinafter "Docket #532] at 15-16; that "interruption" of the new law's application was agreed to by Defendants, and there has been no showing that the interruption resulted in irreparable harm.

[2] It is not clear what Defendants mean when they say that the Board will be "deprived of the fruits" of the resources and training that went into the implementation of Proposition 9. The Board has already recognized the fruit of that training, and it does not "lose" that if the deferral provision of Proposition 9 is suspended or enjoined.

affect any other provision of Proposition 9 or any other procedure at a parole hearing.

Finally, Defendants assert that if they are required to comply with the district court's order enjoining the deferral provisions of Proposition 9, "the taxpayers will be burdened with paying for the hundreds, and perhaps thousands, of unnecessary parole consideration hearings it will have to conduct while this case is pending appeal." (Motion at 17.) Defendants produce neither evidence nor any argument specific to the case to support that; it is another argument of non-specific, potential harm that would apply to every case in which the federal court finds a constitutional violation in a state law that fails to provide for hearings or timely hearings for some citizens. It is also divorced from the evidence and the realities of the parole process.

Plaintiffs do not challenge that without a stay the parole board will have to conduct some number of hearings it would not otherwise be holding *at this time*[3] or that there is *some* cost associated with holding a parole hearing. There is *no* evidence to suggest how many hearings are involved or what the cost may be. But what is clear *from the evidence* is that the hearings are not "unnecessary" and that there is likely to be net savings to the state.

_____

[3] This is solely a matter of timing. Any prisoner who had his hearing moved up because he received an old-law deferral instead of a Proposition 9 deferral is, at some point, entitled to his next hearing; the relief given, and any stay, affect only the timing of that hearing.

The hearings are not "unnecessary" because life prisoners are *entitled* to parole once they have reached their minimum eligible parole date and are no longer dangerous. *In re Lawrence*, 44 Cal.4th 1181 (2008). The undisputed evidence at trial showed that many prisoners are within one or two years of suitability for parole and are being held in prison beyond their suitability solely because they cannot get to a hearing to get the parole grant. *See* Docket #532 at 11-12, 48-49. As Defendants themselves point out (Motion at 3), the grant rate for those who get to hearing has steadily and significantly increased over the last several years; indeed, one-third of prisoners who do get to hearing each year are currently granted parole.[4]

There is not even a suggestion of the number of hearings that would be held during an appeal if no stay were granted that would not have to be held at this time if a stay issues, but there is no reason to believe it would be "thousands" as Defendants assert. The evidence establishes that under Proposition 9, half of all denials each year result in three-year deferrals, the lowest deferral available under Proposition 9 and given to those the parole board itself believes are closest to parole suitability.[5] (RT

---

[4] The undisputed evidence at trial showed that the grant rate in 2011 was 25 percent and in 2012 was 29 percent. (RT 231) The Board's current reports show that the grant rate was 29 percent in 2013 and 35.6 percent for the first six months of 2014. *See* cdcr.ca.gov/BOPH/docs/pshResults.html (last visited August 5, 2014).

[5] That continues to be the case. In the first six months of 2014, there were 880 denials and 439 of those resulted in three-year deferrals. *See*

231.)  Even if all prisoners given three-year deferrals this year[6] had those deferrals converted to one-year deferrals,[7] it would still be six months from now before any of them reached their next hearing and at least eighteen months before all of them did. Assuming this appeal is still another eighteen months from completion, at the current rate at which the Board holds hearings and imposes denials, that would result in less than 1,800 prisoners scheduled for hearings without a stay who would not be scheduled in that time with a stay.  Even if *all* of them went to hearing,[8] that is an additional 100 hearings a month placed on calendars that already exist and held by commissioners and deputy commissioners who are already at the prisons to conduct hearings.[9]  There is

_____

cdcr.ca.gov/BOPH/docs/pshResults.html (last visited August 5, 2014).

[6]  The relief granted is prospective only, so it does not affect any deferral set before February 28, 2014.

[7]  One would expect that some of those given three-year deferrals would have their deferrals converted to two years.  The undisputed evidence at trial established that under the old law 35 percent of prisoners denied parole each year were given one-year deferrals and another 31 percent were given two-year deferrals.  *See* Exhibit 51 (https://ecf.caed.uscourts.gov/doc1/03314995125).

[8]  The evidence shows that only about half of scheduled hearings result in actual hearings and decisions on the merits; the other half are disposed of without hearings through stipulations, postponements, cancellations and waivers.  *See* Exhibit U.

[9]  In 2013, there were 2,039 parole suitability hearings held.  *See* cdcr.ca.gov/BOPH/docs/pshResults.html (last visited August 5, 2014).  A panel requires only a single commissioner, and there are twelve commissioners; so each commissioner had to conduct an average of 170 a year or 14 a month.  Adding 100 hearings a month to the Board's schedule would raise those averages to 270 a year or

no reason to believe that any incremental cost involved in adding these hearings is anything but marginal; certainly, Defendants have produced nothing to suggest there is any meaningful cost involved.[10]

More important, whatever incremental costs are involved in holding the hearings, they would almost surely be offset by savings to the state. The average

---

23 a month, which is less than what it was under the old law. (In 2009, the last year before the mandatory minimum deferrals under Proposition 9 affected the calendaring of hearings, the Board held 3,397 hearings. *See* Exhibit U. That was an average of 24 hearings a month for each commissioner.) Conducting only two hearings a day (hearings average about two and a half hours each (RT 296)), only four days a week, only three weeks a month would allow each commissioner to conduct an average of 24 hearings a month and still have a minimum of six workdays a month for other matters; indeed, if three hearings a day were conducted, the commissioners would be able to meet the increased workload for the month in two weeks, four days a week, leaving more than half the month to attend to other matters.

[10] Defendants seem to think that any cost is irreparable harm, but that is inconsistent with the law. This Court has rejected the contention that irreparable harm is established simply because taxpayer monies that would not otherwise be spent (or would be spent on other matters) will be required. *See, e.g., Harris v. Board of Supervisors*, 366 F.3d 754, 766 (9th Cir. 2004) (county supervisors had voted to close one hospital and reduce care at another in order to meet budget shortfall; chronically-ill, indigent patients sued and obtained a preliminary injunction; the county argued it was irreparably harmed by the injunction because it would have to cut other programs in order the keep the hospitals open and at full care; this Court found such an assertion to be "much more speculative than probable" harm and upheld the preliminary injunction). *See also M.R. v. Dreyfus*, 663 F.3d at 1119 (state provided declaration from head of agency stating that the preliminary injunction would mean elimination of some programs in order to comply with injunction requiring state to continue to pay for in-home care for disabled; this Court rejected argument that was a showing of irreparable harm, finding it was neither specific nor particularized).

annual cost to keep a prisoner incarcerated was $51,889 in 2012.[11]  *See* Legislative

Analyst's Report: CALIFORNIA'S CRIMINAL JUSTICE SYSTEM (2013) at p.50

(found at http://www.lao.ca.gov/reports/2013/crim/criminal-justice-primer-011713.pdf

[last visited August 5, 2014]).  That means the state recognizes a savings of over

$4,300 a month for each prisoner who is found suitable sooner rather than later.  At a

grant rate that is currently more than 35 percent, we can expect that about one-third of

the prisoners who get to hearing while this appeal is pending will be found suitable for

parole and released;[12] that is a potential savings of *millions* of dollars for the state.  *See*

*M.R. v. Dreyfus*, 663 F.3d at 1119-20 (upholding preliminary injunction preventing

state from implementing its new regulation reducing payment for in-home care for

disabled despite state's contention that continued payment will cost the state money

because the evidence showed that any savings would be offset by the state having to

pay for institutionalized care for those who could not stay home if in-home care

---

[11]  The primary cost drivers are security (47 percent) and health care (31 percent).  Because life prisoners are generally older than other prisoners and many are over 50 years, they have more health issues; thus, they are likely to cost more, on average, to hold in prison.  *See* Legislative Analyst's Report: CALIFORNIA'S CRIMINAL JUSTICE SYSTEM (2013) at pp. 47, 50.

[12]  That is especially so since the Board itself has recognized these prisoners are close to parole suitability by giving three-year deferrals despite the fact that such a deferral under Proposition 9 requires a finding by clear and convincing evidence that the prisoner does not need more time to become suitable.

payments were reduced).

## 2. Proposition 89

The relief given by the district court on the Proposition 89 claim precludes the governor "from imposing longer sentences on class members than are called for by application of the same factors the Board is required to consider." (*See* Docket #532 at 58.) The California Supreme Court held in 2002 that the governor's exercise of authority under Proposition 89 "must be based upon the same factors that restrict the Board in rendering its parole decision." *In re Rosenkrantz*, 29 Cal.4th 616, 660 (2002). Thus, as Defendants themselves recognize (Motion at 13-14), the relief given by the district court is already the law in California;[13] and Defendants have consistently contended that all governors have and do follow that mandate. *See, e.g.,* Motion at 9. It is unclear how a federal mandate that is exactly what Defendants concede the current state mandate is creates a probability of irreparable harm to Defendants.

Defendants hypothesize that "numerous class members" who have their parole grants reversed by the governor will litigate the "meaning and enforcement" of the remedy given by the district court. (Motion at 16.) There is nothing to support that assertion. More important, it makes no sense: the meaning is entirely clear and is

---

[13] Plaintiffs' cross-appeal challenges the limited scope of that relief; but unless and until this Court alters the relief, that is the only mandate placed on the state.

virtually the same language used in *Rosenkrantz*, so any prisoner who wishes to litigate the language can litigate it regardless of the relief given in this case.

The suggestion of "numerous" cases leading to "inconsistent" rulings is divorced from reality. The relief given is prospective only and thus applies only to those prisoners who committed their offenses before November 1988 and had their grants of parole reversed by the governor after February 27, 2014. That is a limited, and dwindling, number of prisoners.[14] And there is no reason to think that litigation would result in "inconsistent" rulings; certainly, in the twelve years since *Rosenkrantz*'s nearly identical language, there have been no inconsistent rulings.

The assertion that the state will be "forced" to defend such challenges "at a significant cost that cannot be recouped" is a blithe assertion which does not support a stay, but it is also misleading. Many prisoners who have their grants of parole reversed by the governor challenge that action in court and virtually always challenge the evidence and the factors upon which the governor relied.[15] The state is already

---

[14] Of the 588 grants of parole reviewed by the governor in 2013, only 67 reversals were in cases in which the offenses took place before November 1988. *See* gov.ca.gov/docs/2013_Executive_Report_on_Parole_Review_Decisions.pdf (last visited August 7, 2014).

[15] The evidence at trial showed that during a four-year period (2009-2012) there were 165 challenges to governor reversals resolved by opinion by the intermediate appellate courts. *See* Exhibit 57: https://ecf.caed.uscourts.gov/doc1/03314995131. And, as Defendants brought out in examination, that number does not

required to defend those challenges. Even were such prisoners to add some new claim relative to the meaning of the relief in this case to the challenges they were already making, any cost for the state to defend one additional claim would be incremental;[16] certainly, Defendants have produced nothing to suggest otherwise.[17]

### 3. Conclusion on Probability of Irreparable Harm

Defendants have asserted nothing more than non-specific, generic harm they *might* suffer without a stay. That does not come close to meeting their burden to show a *probability* of *case-specific* irreparable harm. Without that showing, a stay is not justified regardless of the showing on other factors. *Leiva-Perez*, 640 F.3d at 965, 968 (holding that unless the petitioner seeking a stay has made the threshold showing of probability of irreparable harm, "a stay may not issue, regardless of the petitioner's

---

reflect any of the cases brought and decided in superior court and not appealed or any of the cases brought in the intermediate appellate courts that did not result in an order to show cause and thus not an opinion. (RT 251-52.)

[16] That seems particularly clear since any challenge could be defended merely by pointing out that the relief in this case is the same as the holding in *Rosenkrantz*.

[17] Theoretically, a prisoner could seek to litigate in federal court the meaning of the remedy given in this case. But since such litigation would surely be seeking a remedy of release, it would have to be brought by habeas ... which means that state remedies would have to be exhausted first. Since the relief given in this case is prospective only, no class member could challenge any governor reversal before February 28, 2014, and it would surely takes months to prepare and file first a superior court writ, then a Court of Appeal writ, then a state Supreme Court writ or petition for review and finally a federal court writ; by that point, this appeal should be completed.

proof regarding the other stay factors").

## C. Many Prisoners Will be Irreparably Harmed if a Stay Issues

Defendants dismiss any harm to prisoners as "minimal," noting that prisoners will continue to receive their "scheduled parole consideration hearings" and will be granted parole if they can demonstrate their suitability. (Motion at 17-18.) That, of course, ignores the fact that prisoners will wait longer for their "scheduled" hearings if a stay issues than they would have to wait if a stay did not issue. For those prisoners close to parole suitability (those with the minimal deferrals), how long they have to wait for a hearing has a direct impact on how long they will spend in prison.

Although the relief granted here is prospective only, a prisoner who had a hearing March 1, 2014 (after relief was granted) will not be scheduled for his next hearing until at least March 2017, even if the panel that denied parole thought he was very close to being suitable.[18] And the evidence at trial showed that many prisoners will reach parole suitability in less than three years; indeed, before Proposition 9, that was the Board's own assessment in nearly two-thirds of the cases in which it denied parole each year. (*See* Docket #532 at 10-12, 48-49.) Getting to hearing will often

_____

[18] The undisputed evidence at trial showed that panels often note they are only reluctantly imposing the minimum deferral of three years and they do not think the prisoner will need that much time to reach suitability, and that petitions to advance the next hearing are often denied in such cases. *See, e.g.,* Exhibits 45, 48, Exhibit 80 at Y2463-65, B35969.

result in a grant of parole;[19] thus, the timing of the hearing will affect, for many

prisoners, how much time they spend in custody. Spending more time in custody

because a stay requires prisoners to wait longer for the hearings at which they may, and

often will, be granted parole cannot be dismissed as "minimal" harm. Indeed, a

unanimous Supreme Court has held that "any amount of actual jail time" constitutes

"substantial prejudice." *Glover v. United States*, 531 U.S. 198, 203-04 (2001).[20]


### D. The Merits of Defendants' Appeal[21]

This case has been fact-driven litigation, with literally years of discovery, four

days of trial testimony and over 80 exhibits constituting thousands of pages. The only

merits challenge ever made by Defendants to any of the evidence was to the conclusion

---

[19] As noted earlier, in the last few years nearly one-third (now more than one-third) of prisoners who have hearings each year have been granted parole.

[20] *Glover*'s holding was made in the context of a *Strickland* analysis overruling the Seventh Circuit's holding that a potential increase of 6 to 21 months in the prisoner's sentence was not sufficient to establish the prejudice required for relief on an IAC claim, but the standard for *Strickland* prejudice (substantial prejudice) would appear to be much higher than irreparable harm as it applies to determining a stay. Moreover, the rejection of the circuit's ruling was based, in part, on the fact that there "is no obvious dividing line by which to measure how much longer a sentence must be for the increase to constitute prejudice." 531 U.S. at 204.

[21] The merits of Defendants' appeal are legally irrelevant to the issuance of a stay unless this Court finds that they have shown that irreparable harm is probable, for that remains the "necessary but not sufficient condition for the exercise of judicial discretion." *Leiva-Perez*, 640 F.3d at 965.

of Plaintiffs' expert statistician, which was inconsistent with the conclusion of Defendants' expert statistician. That does not mean that there are no arguable issues on appeal; but it is a relevant factor when considering the likely success of any appeal, for only rarely do appeals based on challenges to factfinding or sufficiency of the evidence succeed.

The standard for a stay relative to the merits of appeal is either "a strong likelihood of success on the merits" or "a substantial case on the merits." *Leiva-Perez*, 640 F.3d at 970. Defendants argue that their appeal "raises serious legal question regarding the scope of the Ex Post Facto Clause in the parole context." (Motion at 7.)

### 1. Proposition 9

Defendants argue that the district court relied "heavily" on facial changes to the law regarding deferrals and that such reliance is a "facial challenge" while Plaintiffs' challenge was "an as-applied" challenge; and they assert, citing *Gilman v. Schwarzenegger*, 638 F.3d 1101 (9th Cir. 2010), that this Court has already found "no ex post facto problem" with these provisions. (Motion at 10.) That is *not* the holding in *Gilman*.[22] Moreover, the district court relied on evidence presented regarding the

_____

[22] This Court's opinion in *Gilman* expressly did *not* decide whether the facial changes to the law constituted an *ex post facto* violation. Indeed, after looking at those changes and comparing them to changes upheld in *Morales* and *Garner*, the Court concluded: "Thus, the changes required by Proposition 9 appear to 'create[] a significant risk of prolonging [Plantiffs'] incarceration.'" *Gilman*, 638 F.3d at 1108

results of implementation of the law to find that what seemed likely from the facial changes had in fact occurred.

Defendants note that there were inconsistent expert opinions on whether some evidence presented by Plaintiffs (the so-called *Rutherford* evidence) was representative of the class, as the district court found. (Motion at 10-11.) That is accurate; but since a battle of qualified experts is left to the factfinder to determine which source is more credible and reliable (*City of Pomona v. SQM North America*, 750 F.3d 1036, 1047 (9th Cir. 2014)), Defendants lack any reasonable expectation of prevailing on appeal on such an issue.

Finally, Defendants contend that the petition-to-advance (PTA) provision removes any risk to prisoners of lengthening their incarceration and that the district court found otherwise only by evaluating the PTA process for petitions that "ought of have been granted." (Motion at 12.) That is taken completely out of context. The district court, after finding that the changes in deferral provisions created a significant risk of increasing terms, evaluated the PTA process to determine whether it mitigated that risk. After finding that to mitigate the risk, the PTA process would have to be

---

(citations omitted). Plaintiffs lost their preliminary injunction at issue in that case because the Court found that, without evidence to the contrary, the provision for advanced hearings would appear to reduce the risk of prolonging incarceration. *Id.* at 1109-11. The district court had before it, and relied upon, evidence that showed the effect the deferral changes have had in practice.

likely to result in advanced hearings to those who have reached parole suitability in less time than their Proposition 9 deferral period, the district court looked at the evidence presented relative to PTA rulings. *Relying on the evidence* of specific cases, some in which the Board itself had recognized that the prisoner had reached parole suitability but still refused to advance the prisoner's next hearing, the court found that the risk was not mitigated. In discussing those cases, the court did not make a judgment about whether it thought the PTA should have been granted; indeed, it expressly noted it did not sit to review individual decisions on the merits. (*See* Docket #532 at fn.33.) Rather, it discussed how a process that actually mitigated the risk would have resulted in such PTAs being granted.[23] The district court's finding that the PTA process does not, in practice, mitigate the risk of increased terms is based on the evidence presented, not on the court's personal opinion. Defendants have no realistic chance of prevailing on appeal on the issue.

## 2. Proposition 89

---

[23] For example, the court discussed the case of M. Brodheim who was denied parole in June 2009 and given a three-year deferral. He nevertheless had another hearing in December 2010, due to a federal court order granting relief in a challenge to a prior hearing, and he was granted parole. After *Swarthout v. Cooke*, 131 S.Ct. 859 (2011), was decided, that federal order was overturned, and his grant was vacated and the three-year deferral reinstated. Thereafter, he filed a PTA, giving as the reason for advancing his next hearing the intervening decision by the Board itself that he had reached parole suitability. Nevertheless, his PTA was summarily denied. (see Docket #532 at 41-43.)

Plaintiffs presented *undisputed* evidence at trial that in the 21 years after Proposition 89, a period spanning the tenure of four governors (both Republicans and Democrats), the authority granted the governor by the new law was *never once* used to grant a life prisoner parole, was used only once to reduce the term of a life prisoner who had been granted parole by the Board, but was used over 1,100 times to block the release of prisoners who had been granted parole by the Board and had already completed their terms. We also presented *undisputed* evidence that the governors review every grant of parole but virtually never review denials (three reviews in 21 years).

Citing *Gilman*, 638 F.3d 1101, *Johnson v. Gomez*, 92 F.3d 964 (9th Cir. 1996), and *Biggs v. Secretary of CDCR*, 717 F.3d 678 (9th Cir. 2013), Defendants argue that Plaintiffs' Proposition 89 *ex post facto* challenge fails as a matter of law. (Motion at 7-8). In none of those cases, or any other case, was evidence presented of results of implementation of the law. Since Defendants acknowledge that our challenges here are as-applied challenges and we produced significant evidence on how these laws have, in practice, resulted in life prisoners spending more time in prison, it is difficult to understand how the resolution of facial challenges without evidence control. Indeed, Plaintiffs did exactly what this Court's opinion in *Gilman* suggested: they presented evidence to prove unmitigated risk.

### 3.  Conclusion on Merits[24]

Defendants have not shown either a strong likelihood of success or a substantial case on the merits.  But even if they had, they would not be entitled to a stay.  They would still be lacking in any evidence of probability of irreparable harm  and they cannot show that the balance of hardships are sharply in their favor.

### E.  Conclusion: Balance of Hardships

A stay is never a matter of right, it is instead an exercise of discretion and sound judgment.  *Nken*, 556 U.S. at 433-34.  There are legal prerequisites and standards for a stay, but they represent the ends of a continuum.  "[T]he relative hardships to the parties provid[es] the critical element in determining at what point on the continuum a

---

[24]  Defendants assert they are likely to succeed on a challenge to the relief granted because the district court did not make the findings required under the Prison Litigation Reform Act.  (Motion at 13.)  Defendants never raised that issue in district court, so it is not clear how they think they can raise it on appeal.  *See Armstrong v. Schwarzenegger*, 395 Fed.Appx. 365, 366 (9th Cir. 2010) (unpublished).  Moreover, the purpose of the PLRA was to restrict judicial interference into operations of prisons and thus is restricted to relief "with respect to prison conditions."  *Plata v. Schwarzenegger*, 603 F.3d 1088, 1095 (9th Cir. 2010).  Propositions 9 and 89 have nothing to do with prison conditions.  *See Armstrong v. Davis*, 275 F.3d 849, 872, n.30 (9th Cir. 2001) (holding PLRA not applicable to parole context), abrogated on other grounds as recognized in *Harris v. Alvarado*, 402 Fed.Appx. 180 (9th Cir. 2010)(unpublished).  Moreover, it is another issue divorced from the reality of the case: Defendants themselves say that the Proposition 89 relief is nothing more than what the state already requires and they certainly do not suggest any relief on either claim that could be more narrow than that provided.  *See Plata*, 603 F.3d at 1098; *Armstrong v. Davis*, 622 F.3d 1058, 1070 (9th Cir. 2010).

stay pending review is justified." *Leiva-Perez*, 640 F.3d at 970 (citing *Abbassi*).

Defendants repeatedly assert that there is no way to "restore," "recover," or "recoup" from the harm they will suffer if a stay does not issue, harm they set forth in the most conclusory and ambiguous way: costs in defending hypothetical lawsuits, the "People" being "deprived" of their law, the Board being "deprived" of "the fruits of training." (Motion to Stay at 15-17.) But they never once even acknowledge the harm done to prisoners who will spend more time in prison because of a stay than they would without a stay. Defendants have not satisfied their burden to obtain a stay.

DATED: August 8, 2014   HEATHER WILLIAMS
           Federal Defender
           */s/ Monica Knox*
           MONICA KNOX
           Assistant Federal Defender

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | | |
|---|---|---|
| **RICHARD GILMAN, et al.,** | ) | |
| | ) | |
| Plaintiffs and Cross-Appellants, | ) | D.C. No. 2:05 CV 830 LKK |
| | ) | Eastern District of California |
| v. | ) | |
| | ) | |
| **EDMUND G. BROWN, JR., et al.,** | ) | **CERTIFICATE OF SERVICE** |
| | ) | |
| Defendants and Cross-Appellees. | ) | |
| | ) | |
| _____ | ) | |

I hereby certify that on August 8, 2014, I electronically filed the foregoing

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO STAY THE JUDGMENT

PENDING APPEAL with the Clerk of the Court for the United States Court of Appeals for

the Ninth Circuit by using the appellate CM/ECF system. Participants in the case who are

registered CM/ECF users will be served by the appellate CM/ECF system.

_/s/_ David M. Porter
DAVID M. PORTER